1  ADAM B. WOLF (SBN 215914)
2  PEIFFER ROSCA WOLF
   ABDULLAH CARR & KANE, A
3  PROFESSIONAL LAW CORPORATION
   9696 Culver Blvd., Suite 301
4  Culver City, CA 90232
   Tel: (415) 766-3545
5  Email: awolf@prwlegal.com

6  (*additional counsel on the signature page*)

7  **Counsel for Plaintiffs and the Proposed Class**

8

9
                   **UNITED STATES DISTRICT COURT**
10
                   **CENTRAL DISTRICT OF CALIFORNIA**
11
                       **WESTERN DIVISION**
12

| | |
|---|---|
| ROBERT J. PRINCE, LILLY SHIRLEY, and JOSEPH C. HULL, on Behalf of Themselves and All Others Similarly Situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | DEMAND FOR JURY TRIAL |
| vs. | |
| COMERICA BANK, | |
| Defendant. | |

CLASS ACTION COMPLAINT                    1

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................. 1

II.     PARTIES AND RELEVANT NON-PARTIES ................................... 4

        A.      Plaintiffs ..................................................................................... 4

        B.      Defendant .................................................................................... 5

        C.      Relevant Non-Parties ................................................................. 6

III.    JURISDICTION AND VENUE ........................................................... 7

IV.     CLASS ACTION ALLEGATIONS ..................................................... 8

V.      FACTUAL ALLEGATIONS ............................................................ 10

        A.      The Woodbridge Investment Scheme ...................................... 10

        B.      Proceedings Against Shapiro and Woodridge ......................... 15

                1.      State Proceedings ........................................................... 15

                        a.      Massachusetts ...................................................... 16

                        b.      Texas .................................................................... 17

                        c.      Arizona ................................................................. 18

                        d.      Pennsylvania ........................................................ 18

                        e.      Michigan ............................................................... 19

                2.      Federal Proceedings ....................................................... 19

                        a.      Woodbridge's Bankruptcy ................................... 20

                        b.      The SEC's Civil Enforcement Action .................. 21

        C.      Comerica Abetted and Abetted the Woodbridge Fraud
                Through Substantial Assistance in the Fraud .......................... 22

VI.     THE REGULATORY SCHEME COVERING COMERICA ............ 29

        A.      Know Your Customer Regulations .......................................... 29

        B.      Bank Secrecy and Customer Due Diligence Programs ........... 30

        C.      FFIEC Anti-Money Laundering Guidelines ........................... 30

VII.    AGENCY, ALTER EGO, AND CO-CONSPIRATOR ALLEGATIONS .. 32

VIII.   TOLLING OF THE STATUTES OF LIMITATIONS ........................ 33

IX.     CLAIMS FOR RELIEF ...................................................................... 34

Class Action Complaint          i

COUNT 1 Aiding and Abetting Fraud ................................................................ 34

COUNT 2 Aiding and Abetting Breach of Fiduciary ........................................ 37

COUNT 3 Negligence ........................................................................................ 38

COUNT 4 Gross Negligence ............................................................................. 40

COUNT 5 Unjust Enrichment .......................................................................... 41

COUNT 6 Violation Of The Unfair Competition Law, Cal. Bus. & Prof. Code

     §17200 .................................................................................................... 41

COUNT 7 Violation of California Corporations Code § 25504.1 ...................... 44

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Robert J. Prince, Lilly Shirley, and Joseph C. Hull ("Plaintiffs"), by and through undersigned counsel, allege the following class action claims against Defendant Comerica Bank ("Defendant" or "Comerica") upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal information as to themselves and their own acts. Plaintiffs' information and belief are based upon, among other things, their counsel's investigation, which included, without limitation, review of Defendant's public statements and the public statements of others, filings made with the U.S. Securities and Exchange Commission ("SEC"), interviews, media reports and social media information, as well as other reports, analysis and information.

## I.    NATURE OF THE ACTION

1.    Plaintiffs, individually and on behalf of all others similarly situated who invested in Woodridge FPCM promissory notes or Woodbridge Units (the "Class"), bring this class action against Comerica for aiding and abetting fraud, aiding, abetting breach of fiduciary duty, negligence, unjust enrichment, gross negligence, and violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL") and the California Corporations Code § 25504.1.

2.    Plaintiffs and the Class' claims arise out of their purchases of investments from the Woodridge group of companies. Unbeknownst to Plaintiffs and Class Members, Woodridge was a fraud made possible by Comerica having aided and abetted the Ponzi scheme that collapsed when Woodbridge and most of its affiliated companies filed for bankruptcy in December 2017, causing staggering losses for Plaintiffs and the Class. Comerica maintained Woodridge's bank accounts throughout the fraud and helped facilitate and substantially assist and had knowledge of Woodridge's fraudulent activities. Such Ponzi scheme could not have been accomplished without Comerica's participation.

3.     The SEC defines a Ponzi scheme as follows:

"A Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors to create the false appearance that investors are profiting from a legitimate business."

4.     Each Ponzi scheme typically shares three common characteristics:

- The business activity depends on outside investor money.
- The investor money is not used according to the stated purpose. Some of the investor money is used to pay the returns promised to earlier investors.
- The business enterprise lacks profits sufficient to provide the promised returns and, therefore, depends on an ever-increasing supply of investor money.

5.     Woodbridge was a classic Ponzi scheme.  In summary, Woodridge's scheme and Comerica's assistance worked as follows: Robert H. Shapiro was the owner and operator of The Woodridge Group ("Shapiro").   Shapiro and his Woodbridge Group of companies marketed and sold promissory notes and other offerings that were purportedly low-risk and high-yield investments because they were purportedly backed by high-interest real-estate loans made to third-party commercial borrowers.   Unbeknownst to investors, nearly all of the allegedly supporting real-estate loans were to Shapiro's own shell companies, and in reality Woodbridge had few third-party commercial borrowers.  Rather, in classic Ponzi scheme form, Woodridge lacked revenue from the phantom business to pay returns owed to Plaintiffs and the Class and instead paid returns using new investor money.

Class Action Complaint          2

6.      Woodbridge received $1.2 billion from 8,400 investors and made principal payments to investors totaling approximately $265 million, resulting in a net liability due to investors of approximately $961 million. Returns payments made to investors totaled approximately $103 million. From July 11, 2012 through September 30, 2017, Woodbridge generated approximately $47.9 million of income, of which only $13.7 million was interest payments from borrowers. Conversely, Woodbridge funded more than $103 million of returns to investors labeled as interest and dividend payments. Other than investor funds, there was no other meaningful source of operating or other cash flow to Woodbridge to fund the difference between the investor returns and mortgage interest income. Woodbridge did not generate sufficient cash flow from mortgage receivables, other real estate investments or any other source to fund the payments to investors.  The only other source of funds available to Woodbridge to make the $265 million of principal payments and $103 million in returns to investors were funds from later investors – a classic Ponzi scheme attribute.

7.      Shapiro raised more than $1.22 billion from investors before the Ponzi scheme collapsed when most of the Woodbridge companies filed for Chapter 11 bankruptcy in December 2017.  While not seeking restitution for investors, the SEC has named Shapiro and his Woodbridge entities as defendants in a recent enforcement complaint.

8.      Shapiro's banking activities at Comerica were integral to his scheme to defraud investors and there many glaring red flags that provided Comerica with sufficient notice that Shapiro was misappropriating over $21 million in investor funds from the Comerica accounts.  For example, lacking in any meaningful internal controls, Woodbridge repeatedly engaged in numerous atypical banking activities, such as lavishly spending millions of dollars on private jets, luxury cars, expensive jewelry, and other fancy goods financed through Comerica accounts. Shapiro also diverted substantial investor proceeds from investor accounts to his

wife and her company.   Despite being a supposed billion dollar enterprise, Comerica knew Shapiro remained the sole signatory on each Woodbridge account and had insisted on hand-signing every check to investors and sales agents. Woodbridge and Shapiro also moved $368 million in new investor funds to pay existing investors out of Comerica accounts.  Shapiro pooled investment funds from holders of promissory notes and of his other fraudulent offerings in fund entity accounts, further commingling those funds into a single Woodbridge operating account under his control.  Such commingling involved transfers of approximately $1.66 billion and nearly 11,000 Comerica account transactions.  Raising yet another red flag, instead of hiring external auditors, Woodbridge relied on a controller who was not a certified public accountant. Indeed, Woodbridge bank accounts were opened and/or maintained at Comerica even after several state regulatory agencies ordered Shapiro to cease and desist operations.

9.   Because Comerica substantially assisted and had knowledge of the Woodbridge investor fraud, Comerica is therefore liable to Plaintiffs and the Class for their losses.

## II.   PARTIES AND RELEVANT NON-PARTIES

### A.   Plaintiffs

10.   Plaintiff Robert J. Prince ("Prince") resides in West Chester, Pennsylvania and invested as follows:

| Entity | Date | Amount |
|--------|------|--------|
| Woodridge Mortgage Investment Fund 4, LLC | December 2, 2016 | $200,000 |
| Woodridge Mortgage Investment Fund 3A, LLC | September 22, 2016 | $120,000 |
| Woodridge Mortgage Investment Fund 3, LLC | November 12, 2014 | $250,000 |
| Woodridge Mortgage Investment Fund 3, LLC | November 4, 2014 | $250,000 |
|  | TOTAL: | $820,000 |

Class Action Complaint          4

11.     Plaintiff Lilly Shirley ("Shirley") resides in Harriman, Tennessee and invested as follows:

| Entity | Date | Amount |
|---|---|---|
| Woodridge Mortgage Investment Fund 4, LLC | October 16, 2017 | $269,510 |
| Woodridge Mortgage Investment Fund 4, LLC | August 16, 2017 | $235,000 |
| | TOTAL: | $504,510 |

12.     Plaintiff Joseph C. Hull ("Hull") resides in Media, Pennsylvania and invested as follows:

| Entity | Date | Amount |
|---|---|---|
| Woodridge Mortgage Investment Fund 3A, LLC | September 20, 2016 | $250,000 |
| Woodridge Mortgage Investment Fund 3, LLC | July 7, 2015 | $200,000 |
| Woodridge Mortgage Investment Fund 3, LLC | November 11, 2014 | $250,000 |
| Woodridge Mortgage Investment Fund 2, LLC | August 28, 2014 | $250,000 |
| | TOTAL: | $950,000 |

**B.     Defendant**

13.     Defendant Comerica Bank is a Texas banking association with its principal place of business in Dallas, Texas, is chartered by the State of Texas and subject to supervision and regulation by the Texas Department of Banking under the Texas Finance Code.  As a member of the Federal Reserve System subject to the Federal Reserve Act, Comerica Bank is subject to federal regulations.

14.     Comerica Bank is a subsidiary of Comerica Incorporated, an entity incorporated in Delaware and headquartered in Dallas, Texas.  Comerica Incorporated is among the 25 largest commercial United States financial holding companies based on total assets.

15.     As Comerica Incorporated acknowledged in its 2016 Form 10-K, it and its subsidiaries are subject to United States anti-money laundering laws and regulations.  Comerica represents on its website that it "and all of its subsidiaries, including Comerica Bank, comply with the Bank Secrecy Act (BSA) and USA PATRIOT Act requirements."[1]

16.     All Woodbridge bank accounts were maintained at Comerica.

**C.     Relevant Non-Parties**

17.      Shapiro resides in Sherman Oaks, California, and Aspen, Colorado. He previously served as Woodbridge's CEO, trustee of the RS Protection Trust, and sole operator of most of the entities comprising the Woodbridge Group Enterprise through December 2017.  Shapiro had complete control over the Woodbridge entities and was the sole signatory on Woodbridge's bank accounts at Comerica at all relevant times.

18.     The Woodbridge Group Enterprise operates through a network of affiliated companies that own the various assets comprising its business.  All of these companies are directly or indirectly owned by RS Protection Trust.

19.     Based in Sherman Oaks, California, Woodbridge Group of Companies, LLC is a financial company formed in 2014.  At all relevant times, it served as the primary company through which Shapiro operated the Woodbridge Group Enterprise.

20.     RS Protection Trust is an irrevocable trust settled under Nevada law and controlled by Shapiro.  He serves as the trustee, and members of his family are the sole beneficiaries of the trust.  RS Protection Trust holds all of Shapiro's business entities and personal assets, including Woodbridge Group Enterprise companies.

---

[1] Comerica Bank, Anti-Money Laundering Compliance, available at http://investor.comerica.com/phoenix.zhtml?c=114699&p=irol-govmoney.

21.     WMF Management, LLC is a California LLC controlled by Shapiro. WMF is a holding company for many of the companies comprising the Woodbridge Group Enterprise, all of which Shapiro controlled and operated, and which include Woodbridge Group of Companies, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC.

22.     The Relevant Non-Parties set forth above are not named as defendants in this action. This Complaint does not seek to assert any claim or obtain any relief that falls within the exclusive jurisdiction of the pending bankruptcy proceeding or SEC enforcement action. This Complaint does not involve any claim subject to the automatic stay of bankruptcy-related claims under 11 U.S.C. § 362(a).

## III.    JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because, on information and belief, Plaintiffs and Comerica are citizens of different states, the total amount in controversy exceeds $5 million, excluding interest and costs, and the Class contains more than 100 members.

24.     This Court also has subject matter jurisdiction over Plaintiffs' individual claims under 28 U.S.C. § 1332(b) based on diversity of citizenship.  The amounts in controversy for Plaintiffs' individual claims exceed $75,000, exclusive of interest and costs.

25.     The Court has personal jurisdiction over Comerica because it aided and abetted Shapiro's Ponzi scheme and misappropriation of investor funds in California.  Shapiro is a resident of Sherman Oaks, California, where Woodbridge is based and has employees.   A substantial portion of the residential and commercial properties Woodbridge purchased using investor funds are in Los

Angeles, and many of the Comerica bank accounts used to carry out the fraud were opened or experienced account activity originating in the Los Angeles area, including at Comerica's Studio City branch.

26.    Venue is proper in this District under 28 U.S.C. § 1391 because Comerica is subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

## IV.    CLASS ACTION ALLEGATIONS

27.    Plaintiffs bring this suit as a class action on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all persons and entities who invested in Woodbridge FPCM promissory notes or Woodbridge units.

28.    Excluded from the class is Defendant, its parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and the Relevant Non-Parties listed above.

29.    <u>Numerosity</u>.  The class members are too numerous to be practicably joined.  The class members are identifiable from information and records in the possession, custody, or control of Defendant or the Relevant Non-Parties. Notice of this action can be provided to all members of the class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

30.    <u>Typicality</u>.    Plaintiffs' claims are typical of the claims of other members of the class.  Plaintiffs and each class member invested in Woodbridge investments at issue and were subject to the wrongful conduct alleged in this complaint.

31.    <u>Adequacy of Representation</u>.  Plaintiffs are members of the class and will fairly and adequately represent and protect its interests.  Plaintiffs have no

1  interests contrary to or in conflict with the interests of the other class members.
2  Plaintiffs' counsel are competent and experienced in class action and investor fraud
3  litigation and will pursue this action vigorously.

4        32.  <u>Commonality and Predominance</u>.  Common questions of fact and law
5  exist as to all members of the class and predominate over any questions pertaining
6  to individual class members. Among the questions common to the class are:

7        a.  Whether Shapiro and Woodbridge committed fraud and/or breached
8              duties to Plaintiffs and members of the class;

9        b.  Whether Comerica aided and abetted, joined, and/or participated in
10              Shapiro's and Woodbridge's fraud and/or breach of duties;

11        c.  Whether Comerica knowingly disregarded atypical banking activity
12              and other red flags that Shapiro and Woodbridge were committing
13              investor fraud, breaching fiduciary duties, and/or misappropriating
14              investor funds;

15        d.  Whether Comerica's continued banking support for Shapiro and
16              Woodbridge's violations, to the detriment of Plaintiffs and members of
17              the class, constitutes negligence;

18        e.  Whether Comerica's conduct alleged herein violates the Unfair
19              Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and are
20              entitled to damages or restitution.

21        33.  <u>Superiority</u>.  A class action is superior to all other available methods
22  for the fair and efficient adjudication of this controversy. Although each class
23  member paid at least thousands to dollars to invest in the relevant Woodbridge
24  investments, the cost of litigation will be high.  The factual issues in this case are
25  complex and detailed, extend over several years, and relate to many transactions.
26  Absent a class action, most members of the class would likely find the cost of
27  litigating their claims individually to be prohibitively high and would have no
28  effective remedy.

       Class Action Complaint       9

34.   Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication.   Class treatment will avoid the substantial risk of inconsistent factual and legal determinations of the issues in this lawsuit.

## V.   FACTUAL ALLEGATIONS

### A.   The Woodbridge Investment Scheme

35.   Over 8,400 investors nationwide invested more than $1.22 billion in Woodbridge. Nearly $400 million of this amount was received from approximately 2,600 investors who used their individual retirement account to fund their Woodbridge investment.   Over 75% of the total funds from IRA custodians were received from two IRA custodians.

36.   Investor funds were received as follows:

| Entity | FPCM Investor Funds | Fund Investor Funds | Unknown Type Investors | Total |
|---|---|---|---|---|
| Structured | $4,290,934 | $469,153 | - | $4,760,087 |
| Group | $1,319,268 | - | - | $1,319,268 |
| WMIF 1 | $85,850,185 | $9,337,5000 | $4,172,382 | $99,360,067 |
| WMIF 2 | $140,075,674 | $22,506,789 | $3,008,841 | $165,591,304 |
| WMIF 3 | $325,096,443 | $44,683,952 | $18,460,042 | $388,240,437 |
| WMIF 3a | $269,705,650 | $61,011,339 | $30,972,583 | $361,689,572 |
| WMIF 4 | $111,258,929 | $23,344,852 | $71,382,717 | $205,986,498 |
| **Total** | **$937,597,083** | **$161,353,585** | **$127,996,565** | **$1,226,974,233** |
| **Percentage** | **76.4%** | **13.2%** | **10.4%** | **100.0%** |

37.   Beginning on or around July 2012 and continuing through at least December 4, 2017, Shapiro used investor money to orchestrate a Ponzi scheme through the Woodbridge, which was the principal operating company of Shapiro's

businesses.   Shapiro was the sole owner and maintained exclusive operational control over Woodbridge and each of its entities.

38.    Woodbridge raised money through private placement subscription arrangements under which investors purchased units in Woodbridge funds, and by borrowing funds in connection with promissory notes that investors purchased.

39.    Woodbridge's subscription offerings or "Fund Offerings" typically had a five-year term, and were marketed as paying a 6%-10% annual return on a monthly basis and, at the end of five years, a 2% accrued dividend and share of the profits.   Promissory notes, euphemistically coined "First Position Commercial Mortgages" ("FPCM"), typically had a term of 12-18 months and were marketed as paying a 5%-8% annual return on a monthly basis.  Woodbridge registered neither investment with the SEC or any other government agency.

40.    Only through Woodbridge accounts at Comerica, as well as an extensive sales operation, was Shapiro's scheme made possible. Woodbridge employed a sales force of approximately 30 in-house employees and also relied on hundreds of external sales agents to solicit investments from the public through television, radio, and newspaper advertising, cold calling, social media, websites, seminars, and in-person presentations.  Almost none of these in-house or external sales agents were registered with any regulatory agency.

41.    Interest a Woodbridge affiliate would receive on loans to third-party owners of commercial real estate served as the purported revenue source that supposedly enabled Woodbridge to pay returns to investors.   Woodbridge told investors that its affiliate would pool investor money and lend it to third-party borrowers for short terms, and for only about two-thirds of the value of the real estate securing the transaction, thereby ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing." Woodbridge told investors in a "FAQ" document, "[y]our loan is secured by a hard asset collateral—the property itself."   Woodbridge further told investors that it

conducted all due diligence on the commercial property and borrower, including a title search and appraisal for each property. Woodbridge also represented that the third-party borrower would be obligated to repay Woodbridge the principal amount of the loan after just one year, and that Woodbridge could foreclose on the property to recover the full amount owed in the event of default.

42.    Woodbridge told investors that the third-party borrowers were paying 11-15% in annual interest for "hard money" loans, and that the borrowers were bona fide commercial property owners who could not obtain traditional loans and were willing to pay higher interest rates for short-term financing.

43.    Woodbridge told FPCM investors that their returns would be derived from interest payments on these short term commercial loans, and falsely promised investors a pro rata first-position "lien" interest in the underlying properties. Specifically, "If you have a first position, that means you have priority over any other liens or claims on a property if the property owner defaults." Offering memoranda for the Fund Offerings represented to investors that their funds would be used for real estate acquisitions and investments, including in Woodbridge's FPCMs. In reality, this representation was materially false and misleading because Woodbridge directly applied incoming investor funds to pay other investors' returns.

44.    Woodbridge's marketing materials contained the following graphic regarding the FPCMs:

**Now is the time to forego old-fashioned wealth-building solutions.**

Woodbridge Wealth wants to help you diversify your portfolio by participating in the real estate revolution. What does that look like?

Class Action Complaint          12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



Let us help you protect your retirement funds
from market volatility. We succeed when you
succeed. It's that simple.

16      45.     Woodbridge also wrote in marketing material available to investors

17  and Comerica that it "receives the mortgage payments directly from the borrower,

18  and Woodbridge in turn delivers the loan payments to you under your first position

19  documents."   In reality, nearly all of the purported third-party borrowers—the

20  "owner" and "property owner" in parts 2 and 3 of the above marketing graphic—

21  were entities Shapiro owned and controlled, and that had no bank account or known

22  source of income, and which never made any loan payments to Woodbridge.

23      46.     With knowledge that the Woodbridge scheme was unsustainable,

24  Shapiro and his sales team concealed these facts from Plaintiffs and the Class.

25  Indeed, lacking an inventory of real property loans to support investor loans,

26  Woodbridge employees sent emails in June 2017 reflecting Woodbridge's true

27  operations and future prospects. For example, Woodbridge employee Diana

28

Balayan wrote, "Yikes...that's really bad Dayne. I mean there's no coming back from there." Woodbridge managing director Dayne Roseman replied, "I'm sorry guys. I'm at a loss. I need inventory, now." Responding to Roseman's question as to whether an already encumbered property could be refinanced, Woodbridge employee Lianna Iranossian wrote, "I can't dayne I just can't you are asking the impossible." Roseman replied, "I'm open to suggestions," to which Iranossian responded, "I suggest you kill me lol." Balayan then responded, "Me second."

47. Shapiro artificially propped up Woodbridge's business almost entirely by using funds from new investors in a classic Ponzi scheme to pay returns to existing investors, rather than to secure new Woodbridge-funded real estate property loans to third-party commercial developers. Through this scheme, Woodbridge collected approximately $1.22 billion from FPCM and Fund Offering investors but had issued roughly just $675 million in "loans" for real estate purportedly securing the investments. Instead of generating the promised 11-15% interest, the loans generated only $13.7 million from third-party borrowers—far less than required to operate Woodbridge's business and pay returns. Despite this vast shortfall, Woodbridge paid investors more than $368 million in interest, dividends, and principal repayments. Woodbridge spent another $172 million on operating expenses, including $64.5 million for sales commissions, $44 million for payroll and $21.2 million to finance Shapiro's lavish lifestyle.

48. Shapiro needed the continuous infusion of new investor funds to maintain these Woodbridge operations. He also needed existing FPCM investors to roll over their investments at the end of their terms (ideally into longer-term Fund Offerings) so that Woodbridge could avoid repaying any principal.

49. Woodbridge aggressively promoted the FPCM notes in order to generate the large volume of investor funds needed to sustain the Woodbridge operations. Woodridge offered incentives, such as cash bonuses, to brokers who recommended these investments to their clients and established a program called

Class Action Complaint          14

"Pass It On" through which brokers were encouraged to inform their colleagues about the FPCM notes. Under that program, a referring broker would earn 25 basis points on each FPCM sale closed by a broker whom he or she referred.

50.    Shapiro became irate with his high-level employees when fundraising eventually slowed. Shapiro emailed Roseman in May 2016: "i think you have a bunch of overpaid lazy people up there and i am going to start thining [sic] out the ranks and making people work for a living." Roseman responded that terminating employees would "solve nothing" because the company's main brokers were experiencing the same slowdown in raising additional investor funds.  The Ponzi scheme was beginning to collapse.

51.    Woodbridge missed its first interest payments to investors on December 1, 2017, when it owed more than $961 million in principal to investors. On December 4, 2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy.

### B.    Proceedings Against Shapiro and Woodridge

52.    Shapiro and Woodbridge have come under increasing scrutiny and censure by both state and federal regulatory authorities since 2015.

#### 1.    State Proceedings

53.    Woodbridge and its affiliated entities have been the subject of 25 information requests from state regulators. Five regulators—in Texas, Massachusetts, Arizona, Pennsylvania, and Michigan—have issued cease-and-desist or consent orders based on Woodbridge's securities fraud and sales of unregistered securities. There are pending proceedings against Woodbridge entities in Arizona, Colorado, Idaho, and Michigan.

54.    The terms of these consent decrees and cease-and-desist orders demonstrated that Woodbridge was operating an illegal investment scheme. Public filings in Massachusetts, Texas, Arizona, Pennsylvania, and Michigan exposed Woodbridge's unorthodox and unlawful business practices.

55.     The state regulatory agencies that issued the cease-and-desist and consent orders made them available to the public through their respective websites. Minimal monitoring efforts by Comerica would have turned up numerous, serious regulatory actions against Woodbridge, which should have prompted Comerica to conduct reasonable due diligence in response.

### a.     Massachusetts

56.     On May 4, 2015, the Massachusetts Cease and desist order was issued. On that date, the Massachusetts Securities Division entered into a consent order with Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, and Woodbridge Mortgage Investment Fund 3, LLC.

57.     Massachusetts charged that (1) Woodbridge failed to register the FPCM notes as securities as required by law; (2) Woodbridge did not maintain separate financial accounts for each Massachusetts investor, or a separate fund or pool, for payment of the obligations to each Massachusetts investor, instead paying investors from general corporate accounts; (3) investors relied on Woodbridge to properly value the property serving as collateral on the loan, including its potential for depreciation, to file the Massachusetts investor's security interest on local land records, and to obtain title insurance on the property; (4) and "[i]n cases where the property does not adequately collateralize the loan made by Woodbridge, Massachusetts Investors will have to rely on Woodbridge to maintain liquid cash reserves to continue making interest and principal payments despite possible loss in the value of collateral."

58.     By operation of the Massachusetts consent order, Woodbridge was to cease and desist selling unregistered securities in the state, was censured by the Massachusetts Securities Division, rescinded the FPCM agreements with Massachusetts investors and returned their principal investments, and agreed to pay the Commonwealth of Massachusetts a $250,000 civil penalty. Yet, between May

4, 2015 and September 30, 2017, eleven investors in Massachusetts invested $3.2 million in Woodbridge.

### b.    Texas

59.    On July 17, 2015, the Texas State Securities Board issued an emergency cease-and-desist order against Shapiro and Woodbridge Mortgage Investment Fund 3, LLC, among other entities.

60.    Texas entered the following findings of fact: (1) Shapiro controlled Woodbridge; (2) the FPCM notes were not registered for sale as securities in Texas; (3) the brokers selling the FPCM notes in Texas were not registered; (4) Woodbridge and Shapiro did not take reasonable steps to verify that all of its purchasers were accredited investors; (5) Woodbridge and Shapiro failed to disclose Woodbridge's assets, liabilities, and other financial data relevant to Woodbridge's ability to pay investor returns and ultimately principal; (6) Woodbridge failed to disclose how investor funds would be held while Woodbridge attempted to raise sufficient money to fund the commercial loans; (7) Woodbridge failed to disclose the risks associated with the FPCM notes; and (8) Woodbridge failed to disclose that it had entered into a consent order with the Massachusetts Securities Division.

61.    Texas concluded that Woodbridge and Shapiro violated state law by offering unregistered securities for sale and committing fraud in connection with the offer for sale of securities. The Texas State Securities Board accordingly ordered Woodbridge and Shapiro to stop selling the FPCM notes in Texas and to stop committing fraud in connection with the sale of the FPCM notes in Texas.

62.    Shortly after its issuance, the Texas cease-and-desist order was reported in the legal press.[2]  Yet, from July 17, 2015 through September 30, 2017, 25 investors in Texas invested $2.3 million in Woodbridge.

---

[2] Jess Krochtengel, *Texas Regulator Calls Out 3 Businesses For Securities Fraud*, Law360 (July 22, 2015),

### c. Arizona

63. On October 4, 2016, the Securities Division of the Arizona Corporation Commission instituted cease-and-desist proceedings against Shapiro and several Woodbridge affiliates.

64. Arizona charged that: (1) Shapiro controlled the Woodbridge funds; (2) if the real estate did not adequately capitalize the loans, the Woodbridge funds might not have enough liquid cash reserve to continue making investor payments; (3) investor security interests might be invalidated by the Woodbridge funds' failure to perfect the security interests; (4) the Woodbridge funds sold the FPCM notes through unregistered sales agents; (5) Woodbridge falsely told investors that "Woodbridge and its predecessors have never been found to have violated any securities law"; (6) Woodbridge sold unregistered securities in the state of Arizona, using unregistered sales agents, both in violation of Arizona law; and (7) Woodbridge committed securities fraud by failing to disclose the Massachusetts and Texas consent decrees. Yet, from October 4, 2016 through September 30, 2017, 13 investors in Arizona invested $900,000 in Woodbridge.

### d. Pennsylvania

65. On April 24, 2017, the Commonwealth of Pennsylvania Department of Banking and Securities issued an order concluding that Woodbridge violated the Pennsylvania Securities Act of 1972 by offering securities through unregistered sales agents.

66. Instead of defending itself in litigation, Woodbridge entered into a consent decree with Pennsylvania regulators under which it was required to pay a $30,000 fine. Yet, from April 24, 2017 through September 30, 2017, 31 investors in Pennsylvania invested $2.6 million in Woodbridge.

---

https://www.law360.com/articles/682361?utm_source=rss&utm_medium=rss&utm_campaign=articles_search.

### e.    Michigan

67.    On August 8, 2017, Michigan's Department of Licensing and Regulatory Affairs issued a cease-and-desist order prohibiting Woodbridge from offering or selling unregistered securities in the state or omitting material facts in connection with the sale of securities.

68.    Following its investigation, Michigan found: (1) the FPCM notes were unregistered securities; and (2) Woodbridge described the FPCM notes as safe and low-risk, but did not provide financial information to demonstrate its ability to pay promised returns or disclose to investors that it was the subject of several cease-and-desist orders.

69.    Michigan ordered Woodbridge to cease and desist selling unregistered securities in the state, and imposed a civil fine of $500,000.

### 2.    Federal Proceedings

70.    The SEC has been investigating Shapiro and Woodbridge since at least September 2016. The SEC's investigation has focused on Woodbridge's unregistered sale of securities and whether it "is operating a fraud on its investors."

71.    Woodbridge has refused to cooperate with the SEC investigation. The SEC consequently brought two separate enforcement actions, one of which resulted in a motion for civil contempt.

72.    Shapiro and his high-level employees—managing director Roseman and controller Pedersen—refused to answer any questions at their SEC depositions, instead invoking their rights against self-incrimination under the Fifth Amendment.

73.    Woodbridge's intransigence did not prevent the SEC from discovering its fraud. In one of the subpoena enforcement proceedings, the SEC stated, "Woodbridge has represented to investors that bona-fide third parties are borrowing money and repaying interest at a high rate, of which the investors in Woodbridge funds get a portion thereof. However, evidence obtained in our investigation reveals

that many, if not all, of these LLCs may be Woodbridge affiliates with Shapiro as their Manager."

### a. Woodbridge's Bankruptcy

74. On December 4, 2017, Woodbridge filed for bankruptcy under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Woodbridge has attempted to use this voluntary bankruptcy proceeding to procure a stay of the SEC subpoena enforcement actions.

75. Woodbridge alleged in the bankruptcy action that it is now transitioning to an institutional fundraising model and that it has removed Shapiro from control over the entities and replaced him with an independent manager. Nonetheless, Woodbridge agreed to retain Shapiro as a consultant, pay him $175,000 per month, allow him to continue to use multi-million dollar Woodbridge-owned properties in Los Angeles and Aspen at below-market rents, and give him the authority to remove the supposedly independent manager.

76. Moreover, in the bankruptcy action, Woodbridge for the first time asserted the position that the FPCM noteholders, who comprise the vast majority of the creditors, with $750 million of debt outstanding, are unsecured and should lose their entire investment. A footnote in the declaration of the newly appointed independent manager states:

> It appears that few, if any, Noteholders have taken proper steps to perfect their interest in the Notes pursuant to either of sections 9-312(a) or 9-313(a) of the Uniform Commercial Code ("UCC"), which provide that a security interest in promissory notes (such as the collateral securing the Notes) must be perfected by taking possession of the underlying notes or by the filing of a UCC-1 financing statement describing the underlying notes, respectively. The Debtors have confirmed that no Noteholder is in possession of any of the collateral securing the Notes. Further, on information and belief and

Class Action Complaint                    20

based on an investigation, no Noteholder has filed a UCC-1 financing statement with respect to any of the collateral securing the Notes in Delaware, the jurisdiction of the Funds. It therefore appears that any security interests held by the Noteholders is avoidable, such that the Noteholders' claims will ultimately be treated as unsecured claims in these Chapter 11 Cases. The Debtors intend to commence adversary proceedings seeking the avoidance of these security interests.[3]

77.     Woodbridge's position is directly contrary to its promises to the FPCM noteholders in its offering and promotional materials. Those materials make no mention of any need on the part of investors to "perfect" their security interests, but state unequivocally:

- "Secured by commercial real estate";

- "Recorded first lien position";

- "Woodbridge hereby grants to the Lender a security interest in all of the Woodbridge's [sic] present and future right, title and interest in and to any and all of [the collateral]";

- "This note will be secured inter alia by the Collateral Assignment Documents upon execution thereof."

### b.     The SEC's Civil Enforcement Action

78.     On December 20, 2017, the SEC filed a civil complaint for injunctive and other relief charging that Shapiro ran a "massive Ponzi scheme," commingled investor funds, paid existing investors with money garnered from new investors, and misappropriated millions of dollars to "live[] in the lap of luxury . . . spen[ding] exorbitant amounts of investor money in alarming fashion, on items such as luxury automobiles, jewelry, country club memberships, fine wine, and chartering private planes."[4]

---

[3] Declaration of Lawrence R. Perkins, *In re Woodbridge Group of Companies, LLC* (Bankr. D. Del. Dec. 4, 2017), ECF No. 12 at 8 n.9.
[4] *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla. filed Dec. 20, 2017).

79.     According to the SEC, "Woodbridge's business model was a sham"—instead of paying investor returns with interest obtained from legitimate third-party mortgages, Woodbridge and Shapiro aggressively raised funds from new investors and used those incoming funds to pay old investor returns.

80.     The court in the Southern District of Florida acted immediately on the SEC's emergency ex parte motion for a temporary asset freeze and a sworn accounting of all Woodbridge accounts, granting the motion on December 20, 2017, setting a hearing for December 29, 2017, and "find[ing] good cause to believe that unless immediately restrained and enjoined . . . Defendants Shapiro, RS Trust, Non-Filer Shapiro Property LLCs and Non-Filer Shapiro Holding LLCs, will continue to dissipate, conceal or transfer . . . assets that are likely subject to an Order of disgorgement."

81.     The SEC does not seek restitution for the investors who face a substantial risk of losing their investments.

**C.     The Woodbridge Offerings Were Part of a Single, Integrated and Fraudulent Offering of Securities**

82.     The various Woodbridge securities offerings overlapped and were conducted in parallel over a considerable period of time.

83.     All Woodbridge programs offered the same types of securities that were characterized in a substantially similar fashion in their offering documents.

84.     All Woodbridge programs were marketed with substantially similar offering documents, through the same channels and methods, and to the same investors.

85.     All Woodbridge programs were managed, overseen, and promoted by the same individuals, chiefly Shapiro.

86.     All Woodbridge programs raised money for the same purported purpose, and the description of such purpose is substantially similar in the Woodbridge programs' offering documents.

87.     As more fully detailed above, money invested in the various Woodbridge programs was commingled through the Comerica accounts and used to pay other Woodbridge programs' obligations, including Ponzi payments to investors.

88.     The Woodbridge programs' offerings were part of a single plan of financing, were integrated, and comprised a single, unitary, and fraudulent securities offering that victimized all of the Woodbridge investors.

89.     Hence, investors in each and any of the offerings orchestrated by each Woodbridge program are similarly—situated investors in the Woodbridge integrated offering of securities.

90.     The Woodbridge integrated offering of securities was unregistered, nonexempt, and fraudulent.

**D.     Comerica Abetted and Abetted the Woodbridge Fraud Through Substantial Assistance in the Fraud**

91.     Shapiro's banking activities at Comerica were essential to his scheme to cheat Plaintiffs and the Class. He used Comerica account transactions to apply new investor funds to pay existing investor returns, disburse investor funds to his wife and her company, and spend millions in investor funds for his own personal enjoyment.

92.     Shapiro's scheme was based upon raising funds from investors and then depositing and transferring those funds among various Comerica bank accounts in an attempt to conceal the fact that Woodbridge was raising more money than the underlying properties and pledged collateral could support. Shapiro's use of Comerica accounts to shuffle money through a tangle of affiliated entities enabled him to use new money to pay earlier investors, instead of funding payments with interest earned from bona fide third-party mortgages. This is a classic Ponzi scheme.

93.  Shapiro and Woodbridge used primarily the following Comerica accounts to perpetrate their Ponzi scheme and launder and misuse investor money:

- Account number XXXXXXX0647 for Woodbridge Mortgage Investment Fund 1, LLC,
- Account number XXXXXXX3483 for Woodbridge Mortgage Investment Fund 2, LLC,
- Account number XXXXXXX2992 for Woodbridge Mortgage Investment Fund 3, LLC,
- Account number XXXXXXX7897 for Woodbridge Mortgage Investment Fund 3A, LLC,
- Account number XXXXXXX2703 for Woodbridge Mortgage Investment Fund 4, LLC, and
- Account number XXXXXXX8192 for Woodbridge Group of Companies LLC.

94.  Shapiro was the sole signatory on all these accounts, a highly unusual and suspicious arrangement and a serious red flag, as more fully detailed below.

95.  Crucially, *all* of the Woodbridge programs' bank accounts involved in the Ponzi scheme were with Comerica, giving the bank a unique ability to observe and monitor the fraudulent and improper movements of investor funds by Shapiro and Woodbridge, and see the Ponzi scheme they perpetrated.

96.  As Comerica knew, Shapiro received investor money in the Comerica accounts for the Woodbridge programs. From those accounts, Shapiro improperly transferred and commingled investor money into and out of the Comerica account for Woodbridge Group of Companies, in Ponzi scheme fashion. Comerica knew this because it itself effected transfers totaling approximately $1.66 billion, exceeding 10,700 transactions, between the Woodbridge accounts resulting in extensive commingling of investor funds.

97.    Shapiro frequently instructed Comerica to transfer new Woodbridge investor money received in the Comerica account for one Woodbridge program to other Woodbridge programs, and from there to transfer such investor money to earlier investors as supposed returns on those investors' investments, in facially obvious Ponzi scheme fashion. Comerica knew of all these because it itself effected those transfers.

98.    As the SEC-retained forensic accountant noted, Shapiro engaged in a staggering volume of improper transactions that commingled money between Comerica accounts of Woodbridge entities: nearly 11,000 transactions, totaling approximately $1.66 billion.

99.    Also, as the SEC-retained forensic accountant noted, Comerica made hundreds of millions of dollars of improper, Ponzi payments to investors at Shapiro's direction, from Woodbridge accounts.

100.    Comerica was aware of such Ponzi payments because it held the accounts of *all* the Woodbridge programs that were involved in such Ponzi scheme and could see that new investor money was improperly being used to pay existing investors.

101.    Shapiro could not have carried out his Ponzi scheme without getting Comerica to tolerate his activities and look the other way when he engaged in unorthodox asset transfers, sales of unregistered securities (through unlicensed brokers), commingling of investor funds and other highly irregular banking activities.

102.    Under applicable banking regulations, Comerica was required to "know its customers"—Shapiro and Woodbridge—and maintain a customer due diligence program to predict the types and volume of transactions Shapiro and Woodbridge were likely to conduct so that Comerica could identify any suspicious activity. Comerica continued to provide Shapiro with the banking support and

account platforms needed to carry out his scheme to defraud even after state and federal proceedings brought Woodbridge's violations to light.

103.    Woodbridge investors were never informed of the state regulators' actions against Woodbridge, but became aware of them through internet searches. The cease-and-desist and consent orders against Woodbridge were well publicized and caused many Woodbridge investors to demand refunds, placing further pressure on Woodbridge's business and making Woodridge's misconduct even more evident to Comerica.

104.    Importantly, Shapiro's Comerica banking activities themselves provided several indicia of his misconduct even before the state and federal regulatory proceedings commenced. Many of Shapiro's atypical banking activities constituted FFIEC red flags—visible to Comerica but not to individual investors. A major red flag was the fact that Shapiro applied $368 million in new investor funds to pay existing investors out of Comerica accounts.

105.    Shapiro also pooled investor funds in fund entity accounts and commingled them further into a single Woodbridge operating account under his control. As stated above, his commingling of assets involved around $1.66 billion in transfers and nearly 11,000 Comerica account transactions. The unusual nature and high volume of this account activity put Comerica on notice of the illegitimacy of this real-estate investment business, and should have caused Comerica to take responsive measures.

106.    In addition, Shapiro applied investor funds in Comerica accounts to purchase almost 200 properties in the Los Angeles and Aspen areas for around $675 million. The net returns from those properties have been nominal, with many remaining undeveloped, vacant lots. On January 26, 2017, Shapiro emailed Woodbridge managing director Dayne Roseman that "the numbers this month look awful due to lack of inventory," suggesting that Woodbridge "take money in with property pending." Roseman agreed to do so. Comerica ignored Woodbridge's

"awful" financial numbers and the fact that its intake of investor funds was not matched by corresponding real-estate development or lending to genuine counterparties.

107.  Although Woodbridge raised at least $1.22 billion from investors, most of which was allegedly secured by third-party mortgage loans, it issued only $675 million in such loans. Instead of generating the substantial interest promised to investors, the loans generated only around $13.7 million from bona fide third-party borrowers—much less than required to operate Woodbridge's business and pay returns to the investors.

108.  Because Comerica processed the incoming interest payments, it knew that only third-party borrowers were making interest payments to Woodbridge and, significantly, that none of the Shapiro-affiliated entities that had received loans was paying any interest.  Beginning in December 2013, the amount of funds loaned to affiliated entities was in excess of 70% (and as high as 98%).  As of April 28, 2017, out of $736 million in loans outstanding, $718 million (98%) were due from affiliated entities – and these borrowers were not making regular interest payments. Comerica also knew that the interest payments to Woodbridge it was processing did not come close to matching Woodbridge's committed outlays and purported business operations.

109.  A forensic accountant retained by the SEC examined Woodbridge's bank account records and concluded that the transactional activity in Woodbridge's Comerica accounts was not consistent with its purported business model.[5]

110.  The Woodbridge entities maintained their accounting general ledgers in QuickBooks accounting software which the SEC provided to their forensic accountant.  The forensic accountant determined that there was minimal cash received from borrowers for mortgage interest payments.

---

[5] Declaration of Soneet R. Kapila, ¶¶ 76-78, *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla.), ECF No. 36-2.

111.   In particular, the forensic analysis showed that as early as the third quarter of 2012, and continuing through September 2017, Woodbridge did not generate sufficient income and continuously ran at a cash-flow deficit, which by September 2017 had ballooned to $250 million.[6]   Comerica was aware of Woodbridge's long-term lack of profitability, and, as depositary for all of Woodbridge's revenues, Comerica saw that Woodbridge's real-estate business had no meaningful source of incoming cash, except investor funds. Woodbridge's ongoing unprofitability and the suspicious banking activity described above, which Comerica observed, constituted a clear red flag.

112.   It was also a red flag that, although Woodbridge was a billion-dollar enterprise, Shapiro was the sole signatory for all Woodbridge bank accounts and he insisted on hand-signing every check, whether to investors, sales agents, or others. This was highly unusual and a serious red flag to Comerica because a company of Woodbridge's size normally has a management structure with multiple executives and account signatories.

113.   Shapiro, his family members and related entities benefited from the Ponzi scheme and received more than $21.2 million.  Shapiro disbursed investor monies out of Woodbridge's Comerica accounts for such suspicious expenditures as $1.4 million on luxury retail purchases at stores like Chanel, Louis Vuitton, Jimmy Choo, Dolce & Gabbana and Fendi; $1.6 million on home furnishings including antiques; $1.2 million in alimony to his ex-wife; $340,000 on luxury cars; $400,000 on jewelry; almost $700,000 on meals and entertainment; and also on items such as hospitals, doctors, veterinarians and spas.

114.   Shapiro's self-dealing extended to his family as well. His wife and her company, Schwartz Media, received substantial investor proceeds from Woodbridge's Comerica accounts.

---

[6] *Id.* ¶¶ 86-88.

115.   In addition, Woodbridge's bookkeeping system was at odds with its large-scale fundraising activities. Instead of retaining external auditors, Woodbridge relied on a controller in a satellite office who was not even a certified public accountant.

116.   In spite of these signs of an illicit enterprise and the mounting orders against Woodbridge, Comerica failed to report the fraudulent conduct or otherwise respond to the red flags connected with the Woodbridge accounts. It continued to accept deposits of Woodbridge investor money, carrying out the transfers needed to consummate the fraud.

## VI.   THE REGULATORY SCHEME COVERING COMERICA

117.   A myriad of federal regulations requires banks to know their customers, perform due diligence on customer transactions and assess the risk of individual customers' transactions. Comerica's knowledge of or blindness to the glaring red flags raised by the Woodbridge transactions shows its failure to abide by the letter and spirit of applicable regulations.

### A.   Know Your Customer Regulations

118.   Federal law requires banks to know their customers and understand their customers' banking behavior. Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2).  Banks are required to collect information about the holder of each account. Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

119.   The Financial Industry Regulatory Authority (FINRA) also imposes know-your-customer requirements and mandates "reasonable diligence, in regard to the opening and maintenance of every account," including the obligation "to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."

**B.      Bank Secrecy and Customer Due Diligence Programs**

120.    Comerica is obligated to comply with the Bank Secrecy Act (BSA), 12 C.F.R. § 21.21, including anti-money laundering provisions.

121.    The BSA requires Comerica to develop, administer, and maintain a program to ensure compliance with the regulations. The program must be approved by the bank's board of directors, noted in the board meeting minutes and must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

122.    Comerica is also required to develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

123.    Customer due diligence programs must be tailored to the risk presented by individual customers.  The higher the risk, the more due diligence is required. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

124.    Comerica must also designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

**C.      FFIEC Anti-Money Laundering Guidelines**

125.   The federal government established the Federal Financial Institutions Council (FFIEC) in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Anti-Money Laundering Manual summarizes BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies, such as the Federal Reserve, the Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency. *See* FFIEC BSA/AML Examination Manual, at p. 5 (2010).

126.   Banks must ensure that their employees follow BSA guidelines and make compliance a condition of employment.  Compliance with the BSA and its implementing regulations must be incorporated into job descriptions and performance evaluations. Banks are therefore required to train all personnel whose duties may require knowledge of BSA's requirements.

127.   Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual. These red flags include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting

1   businesses sharing the same address; and (12) an unusually large number of persons

2   or entities receiving fund transfers from one company.

3       128.   The FFIEC Manual identifies "lending activities" and "nondeposit

4   account services"—including nondeposit investment products—as services

5   requiring enhanced due diligence and carrying a high risk of money laundering

6   because they facilitate a higher degree of anonymity and involve high volumes of

7   currency. Thus, the FFIEC Manual requires heightened due diligence on the part of

8   banks when such services occur, including determining the purpose of the account,

9   ascertaining the source and funds of wealth, identifying account control persons and

10  signatories, scrutinizing the account holders' business operations, and obtaining

11  explanations for account activity.

12  **VII.   AGENCY, ALTER EGO, AND CO-CONSPIRATOR ALLEGATIONS**

13      129.   At all relevant times, Defendant and each Relevant Non-Party was a

14  principal, agent, alter ego, joint venturer, partner, or affiliate of Defendant and each

15  of the other Relevant Non-Parties, and in doing the acts alleged herein, was acting

16  within the course and scope of that principal, agent, alter ego, joint venture,

17  partnership, or affiliate relationship. Defendant and each Relevant Non-Party had

18  actual knowledge of the wrongful acts of Defendant and each of the other Relevant

19  Non-Parties; ratified, approved, joined in, acquiesced, or authorized the wrongful

20  acts of Defendant and each of the other Relevant Non-Parties; and retained the

21  benefits of those wrongful acts.

22      130.   Defendant and each Relevant Non-Party aided and abetted,

23  encouraged, and rendered substantial assistance to Defendant and each of the other

24  Relevant Non-Parties in perpetrating their fraudulent scheme on Plaintiffs and the

25  class. In taking action, as alleged herein, to aid, abet, encourage, and substantially

26  assist the commissions of the wrongful acts and other misconduct set forth herein,

27  Defendant and each Relevant Non-Party acted with an awareness of its primary

28

Class Action Complaint          32

wrongdoing and realized that its conduct would substantially aid the accomplishment of the wrongful acts and purposes set forth herein.

## VIII. TOLLING OF THE STATUTES OF LIMITATIONS

131. Comerica, aware of the illegal Woodbridge scheme and its injurious effects, fraudulently concealed the scheme by failing to report it while continuing to execute the account transactions that were its lifeblood.

132. Comerica, Woodbridge, and Shapiro fraudulently concealed from Plaintiffs and class members that the overwhelming majority of FPCMs and Fund Offerings were not secured by loans to holders of commercial real estate, that returns on FPCMs and Fund Offerings would be paid from similar investments, and only on condition that those future transactions occur, rather than from interest payments on the sham third-party loans described in the offering materials, that Shapiro was embezzling millions of dollars in investor funds for his own personal use and enjoyment, that Woodbridge and Shapiro had unlawfully failed to register the FPCMs and Fund Offerings with government regulators, and that Woodbridge and Shapiro had entered into several consent decrees with governmental regulators requiring them to stop violating the law.

133. Comerica, Woodbridge, and Shapiro were aware that Plaintiffs and class members did not know about the Woodbridge investment fraud. Comerica, Woodbridge, and Shapiro had superior and exclusive knowledge of that fraud. Despite reasonable diligence on their part, Plaintiffs and class members were kept ignorant by Comerica, Woodbridge, and Shapiro of the factual bases for these claims for relief.

134. The FPCM and Fund Offering sales materials contained misstatements designed to entice Plaintiffs and class members to purchase "safe" and "secured" investments with returns generated by third-party borrowers' interest payments. These fraudulent misrepresentations had the effect of concealing that Woodbridge was, in fact, using primarily new investor funds to fund existing investors' returns.

135.   Plaintiffs and class members reasonably relied to their detriment on Comerica, Woodbridge, and Shapiro's fraudulent concealment of their violations. As a result of this concealment, Plaintiffs and class members did not believe that it was necessary to file a lawsuit.

136.   Plaintiffs and class members did not discover, and exercising reasonable diligence could not have discovered, the facts establishing Comerica's violations or the harm caused thereby until the Woodbridge entities declared bankruptcy and the SEC filed its enforcement action in December 2017. Plaintiffs learned of the relevant actions of Comerica, Woodbridge, and Shapiro through the bankruptcy and SEC actions and their coverage in the press. Only then did Plaintiffs retain counsel to vindicate their rights. Because Plaintiffs could not have reasonably discovered the facts constituting Comerica's violations until December 2017, all applicable statutes of limitation were tolled until then.

## IX.   CLAIMS FOR RELIEF

**COUNT 1**

**AIDING AND ABETTING FRAUD**

137.   Plaintiffs incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

138.   Shapiro and Woodbridge by the actions described herein, directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law, perpetrated fraud on Plaintiffs and Class Members through a series of materially false and misleading statements and material omissions.  Such conduct included having:

(i)   falsely represented that Plaintiffs' and Class Members' investments funds were used to finance commercial loans to bona fide third parties when in fact the supposed third-party borrowers were entities owned and controlled by Shapiro, lacking income and having never made loan payments;

(ii)    misrepresented the true security and nature of the FPCM and Fund Offering investments;

(iii)   failed to disclose that only $675 million of the $1.22 billion received from Plaintiffs and Class Members was actually backed by purported property loans;

(iv)   concealed from investors that Shapiro withdrew millions of dollars of investor funds for such improper purposes as financing expensive jewelry, fancy automobiles, and other personal luxuries; and

(v)    concealed that Shapiro and Woodbridge commingled investor funds and had been paying earlier investors with funds obtained from later investors in a classic Ponzi scheme.

139.   When purchasing the relevant securities, Plaintiffs and Class Members reasonably relied to their detriment upon Shapiro and Woodbridge's fraudulent material misrepresentations and material omissions. Comerica knowingly and substantially assisted Shapiro and Woodbridge in unlawfully defrauding Plaintiffs and the Class, in at least the following respects:

(i)    commingling investments from FPCM noteholders and purchasers of Fund Offering units and improperly transferring investor money from one Woodbridge program to another in Ponzi scheme fashion;

(ii)    taking for deposit funds from Shapiro and Woodbridge derived from the sale of unregistered securities to mostly individual investors;

(iii)   executing improper and atypical financial transactions, such as the transfer of approximately $1.66 billion via nearly 11,000 individual account transactions;

Class Action Complaint        35

(iv)    servicing Woodbridge accounts after five state regulatory agencies had found that Shapiro was engaged in unlawful conduct and had served him with cease-and-desist or consent orders;

(v)    carrying-out atypical banking procedures to accommodate Shapiro, such as Shapiro's insistence that he hand-sign every check to investors and sales agents;

(vi)    failing to implement and adhere to basic compliance and monitoring protocols regarding the use of Plaintiffs' and Class Members' investment funds;

(vii)    failing to identify, monitor, or exercise required due diligence to identify the existence (or nonexistence) of bona fide third-party borrowers;

(viii)    failing to identify, monitor, or exercise reasonable due diligence in response to the glaring regulatory and compliance red flags identified herein; and

(ix)    failing to prevent, report, or otherwise take corrective action in response to Shapiro's misappropriation and misuse of investor funds.

140.    Comerica was aware of its role in the Woodbridge Ponzi scheme and acted knowingly when it provided substantial and material assistance to Shapiro and Woodbridge in carrying out the scheme.

141.    The scheme described herein allowed Comerica to earn income from fees and from investing capital derived from Woodbridge investors in furtherance of the Woodbridge Ponzi scheme, and Comerica therefore substantially benefited from its participation in the scheme.

Class Action Complaint          36

142.   As a direct and proximate result of Comerica having aided and abetted the Woodbridge fraud, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT 2

### Aiding and Abetting Breach of Fiduciary Duty

143.   Plaintiffs incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

144.   Shapiro, as CEO of Woodbridge and trustee of the RS Protection Trust, owed fiduciary duties to Plaintiffs and Class Members, including the duties of loyalty, care, and to deal honestly and in good faith, at all times relevant herein.

145.   Shapiro's fiduciary duties arose from his having maintained complete or substantially complete control over the Woodbridge Group of Companies and each of the relevant Woodbridge investment funds, and having acted as the sole signatory for the Comerica bank accounts in which investor funds were deposited, thereby exercising complete control over those accounts.

146.   As a result of having sold Plaintiffs and Class Members FPCM and Fund Offering investments pursuant to materially false and misleading offering materials, and by misusing, commingling, and otherwise misappropriating Plaintiffs and Class Members' investor funds, Shapiro breached fiduciary duties that he owed Plaintiffs and Class Members.

147.   Comerica provided substantial assistance in Shapiro's breaches of fiduciary duty with knowledge that Shapiro was breaching those duties.

148.   Plaintiffs and Class Members have been damaged in an amount to be determined at trial as a direct and proximate result of Comerica's having aided and abetted Shapiro's breaches of fiduciary duty.

Class Action Complaint          37

# COUNT 3

## Negligence

149.   Plaintiffs incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

150.   Comerica breached its duty of care owed to Plaintiffs and Class Members, and knew or should have known that Shapiro and Woodbridge deposited into Comerica bank accounts were derived from Plaintiffs and Class Members Woodbridge investments and that the deposits constituted investor funds.

151.   As a banking institution, Comerica knew or should have known that it was subject to various common law and regulatory requirements related to monitoring accounts at Comerica, including regulations issued to prevent money laundering and other illicit behavior.

152.   Comerica failed to exercise the reasonable due care owed to Plaintiffs and Class Members by having taken actions that were inconsistent with regard to the maintenance and use of investor funds on deposit in Comerica accounts.  As alleged set forth more fully above, Comerica breached this duty of care by, among other things, the failure to:

    (i)    use reasonable care in connection with the maintenance and use of Woodbridge investor funds;

    (ii)    exercise the requisite due diligence related to discrepancies and inconsistencies that plagued Shapiro and Woodbridge's deposits and outlays of investor funds;

    (iii)    implement and adhere to compliance and monitoring protocols concerning Shapiro and Woodbridge's maintenance and use of investor funds;

    (iv)    identify, monitor, or exercise requisite due diligence related to the regulatory and compliance "red flags" detailed herein,

including after the issuance and publication of several state cease-and-desist and consent orders;

(v)    exercise reasonable care to prevent Shapiro and Woodbridge's operation of a Ponzi scheme through Comerica in which funds in accounts from new investors was paid to earlier investors;

(vi)   to prevent or take appropriate action in response to Shapiro's embezzlement of investor funds for personal luxuries;

(vii)  to notify investors or governmental agencies or regulators of Shapiro and Woodbridge's misappropriation and misuse of investor funds; and thereby

(viii) causing and allowing investor funds to be misappropriated and misused.

153.   As a proximate result of Comerica's breaches of its professional duties, Plaintiffs and Class Members have suffered reasonably foreseeable harm.

154.   The policy of preventing future harm strongly disfavors application of the economic loss rule, particularly given the moral blame attached to abetting investment fraud.  Plaintiffs and Class Members did not enter into contracts with Comerica and, thus, seek recovery in tort.  There is a high degree of certainty that Plaintiffs and Class Members suffered injuries, and those injuries were highly foreseeable to Comerica.  The transactions associated with Woodbridge's Comerica accounts were intended to, and did, directly affect the investors who had been promised returns and delivery of principal.

155.   As a direct and proximate result of Comerica's negligence, Plaintiffs and Class Members have lost substantial funds paid to Shapiro and Woodbridge, have been denied the use of their investment funds, and have been damaged thereby in an amount to be determined at trial.

Class Action Complaint          39

## COUNT 4

### Gross Negligence

156.   Plaintiffs incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

157.   Comerica knew or should have known that it was subject to certain common law, contractual, and regulatory requirements concerning monitoring the Woodbridge accounts it held, including regulations designed to prevent fraud and other illicit behavior.

158.   Comerica owed a duty to Plaintiffs and the Class members to employ at least reasonable care with respect to the maintenance and use of the Woodbridge investors' funds deposited at Comerica.

159.   Comerica breached its duty to Plaintiffs and the Class members in the manner alleged herein and by:

        a.    Misdirecting investor money from the Woodbridge accounts where such money was deposited to other Woodbridge accounts and to Shapiro and/or entities he controlled;

        b.    Making Ponzi payments, at Shapiro's request, in the form of supposed interest and principal payments, to Woodbridge investors from Woodbridge accounts where Comerica knew that new investor money was being concomitantly deposited;

        c.    Processing facially improper requests from Shapiro to divert investor funds from Woodbridge accounts and commingle them into other Woodbridge accounts;

        d.    Failing to implement and adhere to compliance and monitoring protocols concerning Woodbridge's use of Plaintiffs' and Class members' funds;

        e.    Failing to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

f.      Failing to prevent or otherwise take action with respect to Shapiro's misuse of investors' funds in the Woodbridge accounts;

g.      Failing to notify Plaintiffs, members of the Class, or any governmental entity or regulator about the misappropriation of funds designated for investment; and

h.      Causing and allowing investor funds to be misappropriated for the use and/or benefit of Shapiro, his family and his controlled entities.

160.    Comerica was not merely negligent; it was grossly negligent because its conduct showed the want of even scant care and/or was an extreme departure from the ordinary standard of conduct, given the massive evidence of fraud and/or misconduct perpetrated through its accounts. Woodbridge investors entrusted their money to Comerica, but Comerica exercised no care by executing orders given by Shapiro that resulted in the misuse of investors' funds under Comerica's watch. Comerica also extremely departed from the ordinary standard of conduct by executing the vast number of atypical transactions, as described herein, that allowed Woodbridge to misappropriate and misuse investor funds.

161.    Comerica's misconduct as described in the foregoing and throughout this Complaint, directly and proximately caused Plaintiffs and the Class members to lose a substantial portion of the money they invested in Woodbridge. As a result of Comerica's gross negligence, the Class has suffered damages well in excess of $5,000,000, to be determined at trial.

## COUNT 5

### Unjust Enrichment

162.    Plaintiffs incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

163.   Comerica has been unjustly enriched as a result of the conduct described in this Complaint, including but not limited to the bank's failure to employ reasonable care in handling, using and maintaining Woodbridge investor funds, and causing and allowing investor funds to be misappropriated.

164.   Comerica substantially benefited from its participation in the Woodbridge Ponzi scheme. The scheme caused Comerica to earn income from fees and from investing capital derived from Woodbridge investors.

165.   Comerica is guilty of malice, oppression, and/or fraud through its willful and conscious disregard for the rights of Plaintiffs and other members of the Class, through its improper handling and use of Woodbridge investor funds being held at the bank in multiple accounts.  Comerica's willful and conscious disregard for the rights of the Plaintiffs and the Class created an unjust hardship for the Plaintiffs and other class members.

166.   As a result of Comerica's unjust enrichment, Plaintiffs and the Class seek restitution and disgorgement of all ill-gotten fees and capital that Comerica received in connection with Comerica's improper maintenance and use of investor funds on deposit at the bank.

**COUNT 6**

**Violations of the Unfair Competition Law,**

**Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL")**

167.   Plaintiffs incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

168.   Section 17200 of the California Business & Professions Code ("Unfair Competition Law" or "UCL") prohibits any "unlawful," "unfair" and "fraudulent" business practice.

169.   Section 17200 specifically prohibits any "***unlawful*** ... business act or practice."  Comerica has violated §17200's prohibition against engaging in an unlawful act or practice by, *inter alia*, breaching the common laws of aiding and

abetting fraud, aiding and abetting breach of fiduciary duty, and negligence. Comerica's conduct is further unlawful because it failed to comply with relevant banking laws and anti-money laundering regulations, including those requiring development and implementation of a program to ensure adequate due diligence of banking customers and their account activity.

170.   Section 17200 also prohibits any "***unfair*** ... business act or practice." As described in the preceding paragraphs, Comerica's conduct also is unfair in violation of the UCL by reason of its immoral, unethical, oppressive, unscrupulous, and substantially injurious actions and inaction, including failing to: (i) take corrective action after the issuance and publication of the regulatory cease-and-desist and consent orders that recognized Woodbridge's violations, including of laws that prohibit defrauding investors; and (ii) failing to take preventive action and appropriate steps in response to the many irregular banking activities detailed above.

171.   Comerica further knowingly allowed Shapiro to misappropriate and misuse investor funds, and failed to implement and adhere to mandatory banking regulations and anti-money laundering protocols intended to prevent the very type of scheme that characterized Woodbridge and was made possible by Comerica.

172.   The gravity of the harm to Plaintiffs and Class Members outweighs any potential utility of Comerica's conduct.  Comerica's failure to take appropriate and necessary steps to protect investors, particularly against the backdrop of cease-and-desist and consent orders, harms the public at large and forms part of a common and uniform course of wrongful conduct. There are reasonably available alternatives that would have furthered Comerica's business interests, such as immediately reporting the suspicious account transactions and other atypical activities associated with Woodbridge's Comerica accounts.

173.   Comerica's conduct caused and continues to cause substantial injury to Plaintiff and Class Members.

## COUNT 7

### Violation of California Corporations Code § 25504.1

174. Plaintiffs incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

175. As set forth above, the Woodbridge investments were "securities" within the meaning of Section 25019 of California's Corporate Securities Law of 1968.

176. Woodbridge securities were sold in the state of California under California Corporations Code § 25008 because offers to sell those securities originated in California and offers to buy those securities were accepted by Woodbridge in California.

177. Pursuant to California Corporations Code § 25401, "[i]t is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

178. As set forth above, the Woodbridge securities were offered and sold to Plaintiffs and the members of the Class through untrue statements of material facts as well as omissions of material facts in violation of California Code § 25401.

179. Such misrepresented and omitted facts are "material" within the meaning of California Corporations Code § 25401 because they were facts a reasonable investor would consider in deciding whether to invest.

180. As set forth above, Comerica had actual knowledge of such misrepresentations and omissions made by Woodbridge. Comerica was aware of the true facts that Woodbridge was selling investments and was operating a Ponzi scheme.

181. Comerica is liable for misrepresentations and omissions made in connection with the offer and sale of Woodbridge securities under California

1  Corporations Code 25504.1, because Comerica materially aided, with intent to
2  deceive or defraud, in the acts or transactions constituting violations of § 25504 for
3  the reasons set forth in the preceding paragraphs.

4  182.  The aid that Comerica provided to Woodbridge was material – indeed,
5  crucial – because the Ponzi scheme could not have occurred without Comerica's
6  participation.

7  183.  Plaintiffs and members of the Class suffered financial losses because
8  of Comerica's misconduct.

9  184.  Pursuant to California Corporations Code § 25501, Plaintiffs and the
10  members of the class are entitled to damages as set forth in the Code.

11                          **PRAYER FOR RELIEF**

12  WHEREFORE, Plaintiffs pray for a judgment:

13  A.  certifying this action as a class action, appointing Plaintiffs as class
14  representatives, and appointing Plaintiffs' counsel as class counsel;

15  B.  awarding damages or restitution, including pre-judgment interest, on
16  each Count in an amount to be determined at trial;

17  C.  awarding reasonable attorneys' and experts' fees and the costs of
18  litigation; and,

19  D.  granting such other relief as the Court may deem just and proper.

20                        **DEMAND FOR JURY TRIAL**

21  Plaintiffs request a jury trial for any counts for which a trial by jury is
22  permitted by law.

23

24  Dated: January 17, 2018                Respectfully submitted,

25

26                                          *s/* Adam Wolf
                                            ADAM WOLF
27                                          (Bar No. 215914)
                                            ALAN A. ROSCA
28                                          *(Pro Hac Vice Forthcoming)*

Class Action Complaint              45

PEIFFER ROSCA WOLF
ABDULLAH CARR & KANE.
A PROFESSIONAL LAW CORPORATION
9696 Culver Blvd, Suite 301
Culver City, CA 90232
Tel: (415) 766-3534
Email: awolf@prwlegal.com
       arosca@prwlegal.com

ALAN A. ROSCA
*(Pro Hac Vice Forthcoming)*
PEIFFER ROSCA WOLF
ABDULLAH CARR & KANE.
A PROFESSIONAL LAW CORPORATION
1422 Euclid Avenue, Suite 1610
Cleveland, OH 90232
Tel: (216) 589-9280
Email: arosca@prwlegal.com

BERGER & MONTAGUE, P.C.
Michael C. Dell'Angelo
Barbara A. Podell
1622 Locust Street
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604
Email: mdellangelo@bm.net
       bpodell@bm.net

***Counsel for Plaintiffs and the Proposed Class***